UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMES NEWBURRY,

        Plaintiff,

v.

Case No. 1:08-cv-686
Hon. Robert J. Jonker

PUBLISHAMERICA,
LAWRENCE CLOPPER, and
WILLEM MEINERS,

        Defendants.
_____/

## REPORT AND RECOMMENDATION

This matter is now before the court on defendants' motion to dismiss, or in the alternative, to compel arbitration and stay proceedings (docket no. 16).

**I.    Background**

On July 18, 2008, plaintiff filed a complaint with 344 pages of attachments, seeking $25 million in damages against defendants PublishAmerica, Inc. ("PublishAmerica"), and its alleged owners Lawrence Clopper ("Clopper") and Willem Meiners ("Meiners"). *See* docket no. 1. The complaint included a copy of plaintiff's written agreement with PublishAmerica, dated December 13, 2001. *See* docket no. 1-2. The complaint sought damages for deceptive trade practices and false advertisng arising from promises made in the contract. *See* docket no. 1. Plaintiff filed a two-page amended complaint on July 25, 2008, once again alleging deceptive trade practices and false advertising arising from the December 2001 contract. *See* docket no. 4. The court ordered plaintiff to re-file his amended complaint to comply with the court's local rules. *See* docket no. 6.

On August 4, 2008, plaintiff filed his second amended complaint. *See* docket no. 9.[1] This pleading alleges claims including "deceptive trade practices," "false advertising," "accessory to false advertising after the fact," "mental anguish," and "[f]raud committed over the internet by Email and websites." *Id.* Plaintiff alleges that defendants mislead authors "into signing with their company by making false promises that they will market and promote their books and that their works will be available in bookstores across the United States and abroad." *Id.* Plaintiff refers to his contract with defendants as a basis for his claims, stating in pertinent part:

> In our contract it states: That my book would be produced in 365 days after the signing of the contract by both parties. The contract came to me already signed by them, then I signed it. It is stated in the contract it had been signed on December13, 2001. My book was not made public until February, 2004. And there were no hindrances reported. The contract should not be legally binding.
>
> Publish America [sic] has not paid me for all copies sold.
>
> They promise to send out review copies, but do not unless requested by a reviewer, that doesn't even know the book exists. They promise to publisize [sic], market and promote to newspapers and/or magazines throughout the United States and/or the Dominion of Canada, or elsewhere.

*Id.* Plaintiff also alleges that PublishAmerica's website "makes false statements of your book being available in bookstores from sea to shining sea and abroad." *Id.* Finally, plaintiff alleges that PublishAmerica is an "accessory after the fact" to false advertisements of online bookstores which state that copies of his book are for sale. *Id.*

Plaintiff's complaint does not identify the jurisdictional basis for his claims. In the civil cover sheet filed in this court, plaintiff states that his claim is brought under the court's

---

[1] Plaintiff has styled his second amended complaint as his "amended complaint."

diversity jurisdiction pursuant to "Act 331 sec. 3(A)," "Act 92 sec. 5103(2)," "Act 175 sec. 67," and "Act 236 sec. 2945(F)."

Defendants have filed a combined motion pursuant to Fed. R. Civ. P. 12(b)(6) and 56, seeking: to dismiss the complaint for failing to state a basis of personal jurisdiction over the individual defendants, Clopper and Meiners; to dismiss the action for lack of proper venue; to dismiss the action for failure to state a cause of action; and to compel arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 *et seq. See* docket no. 16.

**II.    Discussion**

Defendants' primary contention is that plaintiff's action should be dismissed in favor of the arbitration clause set forth in the parties' contract. The court agrees.[2]

**A.    Plaintiff's complaint**

The court has a duty to read a *pro se* plaintiff's complaint indulgently. *See Haines v. Kerner*, 404 U.S. 519 (1972); *Kent v. Johnson*, 821 F. 2d 1220, 1223-24 (6th Cir. 1987). However, the leniency granted to a *pro se* plaintiff is not boundless. *Martin v. Overton*, 381 F.3d 710, 714 (6th Cir. 2004). While pro se plaintiff is treated to less stringent standards, he is not automatically entitled to take every case to trial, nor does the court's liberal construction of pleadings "require the court to conjure allegations on a litigant's behalf." *Id.*

Plaintiff has alleged that defendants engaged in a variety of fraudulent and deceptive practices. By plaintiff's own allegations, his relationship with defendants arises from an agreement signed with PublishAmerica dated December 13, 2001. This agreement consists of 33 paragraphs,

---

[2] While defendants seek to dismiss plaintiff's action for failure to state a claim, they do not identify plaintiff's state law claim from which this diversity action arises. Rather, defendants argue that plaintiff has failed to state claims under federal statutes (i.e., the Lanham Act and Federal Trade Commission Act).

3

which outlines the business relationship between plaintiff, the author of a book titled "*Serial Killer*" (referred to in the agreement as the "literary work"), and defendant PublishAmerica, Inc., (referred to in the agreement as the "Publisher"), a book publishing company located in Maryland. Agreement at p. 1 (docket no. 17-2). Under this agreement, plaintiff assigned PublishAmerica the exclusive right to publish, sell or export the literary work in the United States, its dependencies, the Philippine Islands and Canada, as well as the exclusive right to arrange for publication in book form in the British Empire and Commonwealth and in all foreign countries. *Id.* at ¶ 1. PublishAmerica agreed to produce the literary work in book form and print copies as the market demands, from time to time, in sufficient quantities to supply purchasers of the work. *Id.* at ¶¶ 2-3. PublishAmerica agreed to pay plaintiff a royalty upon the regular edition of the literary work sold in the Untied States of: 8% of the sales price on the first 2,000 copies sold; 10% on the next 8,000 copies sold; and 12.5% on all copies sold in excess of 10,000. *Id.* at ¶ 3.

Under the agreement, sales promotion, advertising and publicity of the literary work "shall be at the Publisher's election and discretion as to the extent, scope and character thereof and in all matters pertaining thereto." *Id.* at ¶ 17. Plaintiff agreed to give the Publisher the exclusive right for the period of copyright and renewal copyright of the literary work, to negotiate for the sale, lease, license and other disposition of the work in soft cover, hard cover, reprint, and other disposition, such as motion picture, dramatic, radio, television and all other fields. *Id.* at ¶ 20. PublishAmerica agreed "to produce the said literary work within 365 days from the date of the signing of this agreement by both parties thereto, provided Publisher is not hindered by causes beyond its own control, or by the Author." *Id.* at ¶ 25. The agreement also recited "the mutual understanding that neither party has guaranteed, or is to guarantee, the sale of any specific number

of copies of the said literary work, it being impossible to predict, before publication, what success any book may attain." *Id.* at ¶ 23. Finally, plaintiff agreed that PublishAmerica "has not made any prior pledges, promises, guarantees, inducements, of whatever nature, either in writing, by word of mouth, or in any form, that are not contained in the terms of this agreement." *Id.* at ¶ 23.

At issue in the present motion is the agreement's arbitration and forum clause, which provides as follows:

> All unresolved disputes and controversies of any kind and nature within the scope of this agreement (whether arising from fraud, mistake, questions of the existence, validity, construction, performance, nonperformance, operation or breach) shall be submitted to an Arbitrator selected in accordance with the Voluntary Labor Arbitration Rules of the American Arbitration Association. The arbitration shall be conducted in the City of Frederick, Maryland in accordance with the Arbitration Rules, and the decision of the arbitrator shall be final and binding on the parties to the proceeding, subject only to the right of judicial relief as prescribed by law. This agreement shall be governed and construed in accordance with the laws of the State of Maryland. Author and Publisher irrevocably submit to the jurisdiction of any Maryland State or Federal court sitting in the City of Frederick over any suit related to this agreement.

*Id.* at ¶ 30.

### B. Enforcement of the arbitration clause by PublishAmerica

Defendants seek to dismiss this action in favor of the arbitration clause (¶ 30) of the parties' Agreement. This court set forth the rules for enforcing an arbitration clause in *Rugumbwa v. Betten Motor Sales*, 136 F. Supp. 2d 729 (W.D. Mich. 2001), which states in pertinent part as follows:

> A party's agreement to arbitrate is essentially a waiver of the party's right to seek relief in a judicial forum. *See Kennedy v. Superior Printing Co.*, 215 F.3d 650, 653 (6th Cir.2000). The Federal Arbitration Act (FAA), 9 U.S.C. § 2, favors the implementation of arbitration agreements, providing in pertinent part:
>
>> A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter

5

> arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save such grounds as exist at law or in equity for the revocation of any contract.

In *Andersons, Inc. v. Horton Farms, Inc.*, 166 F.3d 308 (1998), the Sixth Circuit discussed enforcement of arbitration agreements under the FAA:

> The FAA establishes a "federal policy favoring arbitration . . . requiring that we rigorously enforce agreements to arbitrate." *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 226, 107 S.Ct. 2332, 2337, 96 L.Ed.2d 185 (1987) (internal quotations and citations omitted). *In Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996), the Supreme Court reiterated that general state contract principles, as opposed to state laws applicable only to arbitration provisions, may regulate, and in the appropriate case, invalidate, arbitration clauses. *See id.* 517 U.S. 681, 116 S.Ct. at 1655-56 (citations omitted); *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944, 115 S.Ct. 1920, 1924, 131 L.Ed.2d 985 (1995) ("When deciding whether parties agreed to arbitrate a certain matter . . . courts generally should apply ordinary state-law principles that govern the formation of contracts.") (citations omitted).

*Andersons, Inc.*, 166 F.3d 308 at 322.

When asked by a party to compel arbitration under a contract, a federal court has four tasks:

> first, it must determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims in the action are subject to arbitration, it must determine whether to stay the remainder of the proceedings pending arbitration.

*Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir.2000), *petition for cert. filed*, 531 U.S. 1148, 121 S.Ct. 1088, 148 L.Ed.2d 963.

*Rugumbwa*, 136 F.Supp.2d at 732.

With respect to the first task, the plain language of the arbitration clause in ¶ 30 evidences the intent of plaintiff and PublishAmerica to settle disputes through arbitration.

As to the second task, the court concludes that plaintiff's claims raised in the second amended complaint fall within the scope of the arbitration clause. This court examines the language of the parties' agreement in light of the strong federal policy in favor of arbitration, resolving any ambiguities in the agreement or doubts as to the parties' intentions in favor of arbitration." *Stout*, 228 F.3d at 714 (citations omitted). A proper method of analysis is to ask if an action could be maintained without reference to the agreement or relationship at issue. *Fazio v. Lehman Bros., Inc.*, 340 F.3d 386, 395 (6th Cir. 2003). If such an action could be maintained, then it is likely outside the scope of the arbitration agreement. *Id.* Pursuant to ¶ 30, the parties agreed to arbitrate "[a]ll unresolved disputes and controversies of any kind and nature within the scope of this agreement (whether arising from fraud, mistake, questions of the existence, validity, construction, performance, nonperformance, operation or breach)." This expansive and broadly worded clause is sufficient to include the disputes raised in the second amended complaint, i.e., deceptive trade practices, false advertising and fraud. All of plaintiff's claims against PublishAmerica arise from a business relationship created by the December 13, 2001 publication agreement. Stated differently, plaintiff would have no claim against defendants if not for this agreement, in which he assigned his right to publish the literary work, *Serial Killers*, to PublishAmerica. *See Fazio*, 340 F.3d at 395.

It is unnecessary for the court to address the third task, because plaintiff does not allege the violation of any federal statute in this diversity action.

Finally, with respect to the fourth task, there is no reason to stay any other claims pending arbitration because all of plaintiff's claims arise from the publication agreement with PublishAmerica.

In his response, plaintiff attempts to avoid the arbitration clause by contending that his action alleges "Wire Fraud by Misrepresentations of Facts on the PublishAmerica website." *See* docket no. 20. Plaintiff states that he is "not seeking relief arising from a contract dispute," and asserts that the arbitration provision "should be considered null and void" because he "[has] no dispute with said contract." *Id.* Plaintiff's contentions are without merit. The alleged acts of "wire fraud" involve the sales promotion, advertising and publicity of plaintiff's literary work. Under ¶ 17 of the agreement, plaintiff assigned these activities to PublishAmerica to perform, within its "discretion as to the extent, scope and character thereof." Characterizing PublishAmerica's promotional efforts as "wire fraud" does not exclude those activities from the arbitration agreement. *See Fazio*, 340 F.3d at 395 (a tort can be covered by an arbitration agreement if the allegations underlying the tort touch matters covered by the agreement). Accordingly, PublishAmerica's motion to compel arbitration should be granted.

          **C.**     **Enforcement of the arbitration clause by Clopper and Meiners**

Plaintiff's only allegation against defendants Clopper and Meiners is that they are the owners of PublishAmerica. Clopper and Meiners contend that the court should include them in arbitration proceedings even though they are non-signatories to the agreement, because plaintiff's claims against them are "inextricably linked" to them as nonsignatory defendants in this action. These two defendants cite *MS Dealer Service Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999), which states that "under agency or related principles, the relationship between the signatory and

nonsignatory defendants is sufficiently close that only by permitting the nonsignatory to invoke arbitration may evisceration of the underlying arbitration agreement between the signatories be avoided."

"[N]onsignatories may be bound to an arbitration agreement under ordinary contract and agency principles." *Javitch v. First Union Securities, Inc.*, 315 F.3d 619, 629 (6th Cir. 2003). Five theories have been recognized for binding nonsignatories to arbitration agreements: (1) incorporation by reference; (2) assumption; (3) agency; (4) veil piercing/alter ego; and (5) estoppel. *Id. See, e.g.*, *Thomson-CFS v. American Arbitration Association*, 64 F.3d 773, 777 (2nd Cir. 1995) ("In the absence of a signature, a party may be bound by an arbitration clause if its subsequent conduct indicates that it is assuming the obligation to arbitrate").

Clopper and Meiners should be allowed to participate in arbitration. In his second amended complaint, plaintiff has made no distinction between PublishAmerica the corporation, and Clopper and Meiners as the owners of the corporation. Rather, plaintiff merely alleged that PublishAmerica, Clopper and Meiners engaged in the wrongful activities. It is undisputed that plaintiff and PublishAmerica agreed to resolve their disputes through arbitration. To allow plaintiff to litigate this pro se action against the alleged owners of PublishAmerica would effectively nullify the arbitration agreement, by forcing PublishAmerica to arbitrate plaintiff's claims in Maryland, while forcing its owners to litigate the same claims in a federal court in Michigan. This result is inconsistent with the FAA, which "was designed to override judicial reluctance to enforce arbitration agreements, to relieve court congestion, and to provide parties with a speedier and less costly alternative to litigation . . ." *Stout*, 228 F.3d at 714 (citations omitted). As the Sixth Circuit observed in *Arnold v. Arnold Corp.-Printed Communications For Business*, 920 F.2d 1269, 1281

(6th Cir. 1990), if a plaintiff "can avoid the practical consequences of an agreement to arbitrate by naming nonsignatory parties as [defendants] in his complaint, or signatory parties in their individual capacities only, the effect of the rule requiring arbitration would, in effect, be nullified." It would be both inequitable and a waste of judicial resources to require defendants to defend the same claims in two different proceedings.[3] Accordingly, defendant Clopper's and Meiners' motion to compel arbitration should be granted.

### III.     Recommendation

Accordingly, I respectfully recommend that defendants' motion to dismiss or to compel arbitration (docket no. 16) be **GRANTED.** and that this action be dismissed.


Dated:  May 12, 2009                       /s/ Hugh W. Brenneman, Jr.
                                           HUGH W. BRENNEMAN, JR.
                                           United States Magistrate Judge



ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within ten (10) days after service of the report. All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).

---

[3] In addition, the court notes that if this action was not dismissed, it would be subject to a motion for change of venue to a court in Maryland. *See* Agreement at ¶ 30 (plaintiff agreed to "irrevocably submit to the jurisdiction of any Maryland State or Federal court sitting in the City of Frederick over any suit related to this agreement").